**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY A. COGAN, | No. 22-16948 |
| *Plaintiff - Appellant*, | D.C. No. 2:21-cv-02087-CDS-EJY |
| and | |
| JEFFREY A. COGAN, ESQ., LTD., | |
| *Plaintiff*, | OPINION |
| v. | |
| ARNALDO TRABUCCO, M.D., | |
| *Defendant - Appellee*. | |

Appeal from the United States District Court
for the District of Nevada
Cristina D. Silva, District Judge, Presiding

Argued and Submitted March 8, 2024
Las Vegas, Nevada

Filed August 21, 2024

Before: Milan D. Smith, Jr., Mark J. Bennett, and Daniel
P. Collins, Circuit Judges.

Opinion by Judge Collins;
Concurrence by Judge M. Smith

# SUMMARY[*]

## *Rooker-Feldman* Doctrine

The panel reversed the district court's dismissal, as barred by the *Rooker-Feldman* doctrine, of attorney Jeffrey Cogan's complaint collaterally challenging a civil judgment entered against him in Arizona state court.

Cogan filed this complaint to collaterally challenge an Arizona state court malicious prosecution action brought against him by bankruptcy debtor Arnaldo Trabucco. Cogan sought a declaration that any claim for malicious prosecution arising solely from conduct occurring in a federal bankruptcy proceeding was exclusively within the jurisdiction of the federal courts and that, as a result, any judgment in the Arizona malicious prosecution action was void. Cogan and Trabuco ultimately reached a settlement of the malicious prosecution action.

The panel held this case is not moot because (1) it fits within the established line of cases holding that a partial settlement agreement specifying the ultimate form of redress that would result from success in litigation does not moot that litigation, and (2) the settlement agreement has not fully resolved the parties' underlying substantive liabilities in a way that precludes the Court from granting any effectual relief.

The panel held that the district court erred in dismissing Cogan's complaint under the *Rooker-Feldman* doctrine. Because Trabucco's malicious prosecution claim

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

is completely preempted by federal law and is within the federal courts' exclusive jurisdiction, it is subject to collateral attack in the federal courts and *Rooker-Feldman* therefore does not apply.

Concurring, Judge M. Smith wrote separately to criticize some of the Court's *Rooker-Feldman* precedents, and to highlight an unresolved circuit split on whether attorneys who allegedly abuse the federal bankruptcy process may be held accountable in state court.

---

## COUNSEL

Jeffrey A. Cogan (argued), Pro Se, Henderson, Nevada, for Plaintiff-Appellant.

Dennis I. Wilenchik (argued), John Wilenchik, and Janis G. Pelletier, Wilenchik & Bartness PC, Phoenix, Arizona; Victoria L. Neal, Kemp and Kemp, Las Vegas, Nevada; for Defendant-Appellee.

**OPINION**

COLLINS, Circuit Judge:

Plaintiff Jeffrey A. Cogan appeals the district court's dismissal of his complaint collaterally challenging, on federal law grounds, a civil judgment entered against him in Arizona state court. The district court held that Cogan's federal complaint was barred by the *Rooker-Feldman* doctrine, "under which a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994) (citing *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 482 (1983), and *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413, 416 (1923)). Because we conclude that this case is not barred by *Rooker-Feldman*, we reverse and remand.

**I**

As we have noted, this case involves a federal court collateral challenge to a judgment rendered in an Arizona state court. In summarizing the factual context, we begin with an overview of the complex litigation leading up to the challenged state court proceedings, and we then review the course of the proceedings in this federal suit.

**A**

In September 2012, Defendant Arnaldo Trabucco, a surgeon, performed kidney surgery on Gerald Scharf in Fort Mohave, Arizona. Scharf, however, died only a few days later. Around the same time, Trabucco was experiencing a variety of legal and financial problems, and in November

2012, he filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Nevada. Plaintiff Jeffrey A. Cogan, an attorney, thereafter represented a number of different creditors asserting claims against Trabucco in the bankruptcy proceedings. After three of Scharf's family members (collectively, "the Scharfs") filed a malpractice action against Trabucco in Arizona state court in March 2013, Cogan took over the representation of the Scharfs in that case, and he also represented the Scharfs in Trabucco's bankruptcy proceedings.

In May 2013, while the Scharfs' malpractice claim was still pending in Arizona state court, Cogan filed an adversary complaint on the Scharfs' behalf against Trabucco in the Nevada bankruptcy court, seeking a determination that Trabucco's liability to the Scharfs was nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(6).[1] Among other things, those provisions respectively exempt from a bankruptcy discharge certain debts for money obtained by "false representation[s]," and debts "for willful and malicious injury by the debtor" to any person. 11 U.S.C. § 523(a)(2)(A), (a)(6). In support of these nondischargeability claims, Cogan's operative adversary complaint on behalf of the Scharfs alleged that Trabucco had committed willful and malicious injury on Gerald Scharf during the kidney surgery and that Trabucco had made fraudulent statements to Gerald and his family members before and after the surgery. Cogan later explained that he made these allegations because he thought that otherwise the

---

[1] The adversary complaint initially included, as an additional cause of action, the Scharfs' underlying negligence claim against Trabucco, but that claim was later dropped from the Scharfs' operative amended adversary complaint.

Scharfs' state court claims against Trabucco would be dischargeable in the bankruptcy.

Nonetheless, in February 2014, the Scharfs ultimately stipulated with Trabucco to dismiss the adversary complaint in bankruptcy court with prejudice. In the stipulation, Trabucco agreed not to seek attorneys' fees or costs in connection with the dismissal of the adversary complaint. The stipulation stated that the Scharfs could continue to pursue their previously filed state court malpractice suit (or a subsequent such suit), but that "any such further litigation will be limited to claims sounding in negligence and will not include any allegation of malicious or intentional conduct by Dr. Trabucco."

Less than three weeks after the stipulated dismissal of the Scharfs' adversary complaint in bankruptcy court, Trabucco filed suit against Cogan and the Scharfs in Arizona state court, alleging that the filing of the adversary complaint constituted malicious prosecution, abuse of process, and intentional infliction of emotional distress.

Meanwhile, the Scharfs' state court negligence claims against Trabucco were ultimately unsuccessful. In April 2014, Trabucco filed a motion to dismiss the Scharfs' malpractice case for failure to prosecute, and the state court granted that motion on June 11, 2014. On July 16, 2014, the bankruptcy court entered an order discharging Trabucco from all pre-petition debts, including those associated with the claims asserted by the Scharfs. The Scharfs subsequently pursued a renewed malpractice action in Arizona federal court against Trabucco, and that suit was allowed to go forward, despite Trabucco's discharge, solely for the purpose of obtaining a recovery from Trabucco's malpractice insurer. In October 2017, the jury rendered a

verdict for Trabucco in the federal malpractice case, and the Scharfs did not appeal the resulting adverse judgment.

With the bankruptcy proceedings and the Scharfs' malpractice suits concluded, the only litigation remaining between the parties was Trabucco's malicious prosecution action against Cogan and the Scharfs in Arizona state court. In January 2018, that court granted Trabucco's motion for partial summary judgment as to liability on his malicious prosecution and abuse of process claims against Cogan and the Scharfs. At a subsequent state court trial limited to the issue of damages, the jury awarded Trabucco no damages against the Scharfs, but a total of $8,000,000 in damages against Cogan (consisting of $6,232,000 in compensatory damages and $1,768,000 in punitive damages).

Cogan appealed this judgment to the Arizona Court of Appeals. In April 2020, that court affirmed the trial court's finding of liability for malicious prosecution, reversed its finding of liability for abuse of process, vacated the damages award, and remanded for a new trial limited to "the issue of damages arising out of Cogan's malicious prosecution of Dr. Trabucco in the bankruptcy proceedings." Trabucco filed a petition for review in the Arizona Supreme Court. In response, Cogan filed in that court a motion to dismiss the case, arguing for the first time that the Arizona state courts lacked subject matter jurisdiction over the matter because it involved conduct that occurred during a federal bankruptcy proceeding. On December 16, 2020, the Arizona Supreme Court issued an order denying, without explanation, both Cogan's motion to dismiss and Trabucco's petition for review. On remand, the Arizona state trial court set the new damages trial against Cogan for December 15, 2021.

**B**

Less than one month before the scheduled retrial of the malicious prosecution action in Arizona state court, Cogan filed this suit in Nevada federal court seeking to collaterally challenge that action.[2]  Specifically, Cogan filed a complaint against Trabucco seeking a declaration that any judgment in the Arizona malicious prosecution action "is not valid and not enforceable against Cogan" and "*void ab initio*" due to "lack[]" of "subject matter jurisdiction."  Cogan argued that any claim for malicious prosecution arising solely from conduct occurring in a federal bankruptcy proceeding was exclusively within the jurisdiction of the federal courts and that, as a result, any judgment in the Arizona malicious prosecution action was void.  In seeking this declaratory relief, Cogan invoked the district court's federal question jurisdiction under 28 U.S.C. § 1331 and its diversity jurisdiction under 28 U.S.C. § 1332.

On the scheduled retrial date of the Arizona malicious prosecution action, Cogan and Trabucco reached a settlement of that action.  The settlement's terms were memorialized in a one-page written agreement. Section 1 of that agreement stated that the parties "stipulate to the entry of a Judgment against [Cogan] in the amount of eight million dollars."  Section 2(a) provided that Trabucco "covenants not to execute on the Judgment" and that this covenant would "remain in effect" regardless of whether Cogan "files for bankruptcy."  The agreement also contained several terms that addressed Cogan's pending Nevada federal

---

[2] Although Cogan's law firm was listed as a co-plaintiff in this federal action, that firm was no longer a party to the state malpractice action at the time of the Arizona Court of Appeals' decision.  Only Cogan appealed the district court's judgment in this federal action, and the law firm is therefore not a party to this appeal.

lawsuit and its potential impact on the Arizona case. Specifically, the agreement stated, in section 2(c), that "[i]f Dr. Trabucco prevails in the Nevada case—meaning, that the district court denies" Cogan's requested declaratory relief— then Cogan "agrees to pay [Trabucco] the sum of eight million dollars" as an "unsecured, dischargeable debt that arises solely out of contract." The parties further stipulated, in section 2(b), that Trabucco's Arizona state court claim for malicious prosecution had arisen "solely out of claim(s) and allegation(s) made in [the] Adversary Complaint" in Trabucco's bankruptcy proceedings. Section 3 of the agreement contained a "mutual general release" that specifically excluded any claims asserted in Cogan's pending Nevada declaratory relief action and any "obligations created by or arising from" the settlement agreement.

The net effect of this settlement agreement was (1) to formally reinstate an $8,000,000 judgment against Cogan in the Arizona malicious prosecution action; and (2) to couple that reinstatement with an agreement by Trabucco that, if that judgment survived Cogan's collateral challenge in the Nevada action, then in lieu of direct enforcement of that judgment, Trabucco would accept a fully dischargeable substitute contractual obligation for the same amount. The stipulated judgment in the Arizona malicious prosecution action was entered by the Arizona state court on January 18, 2022.

On November 18, 2022, the district court granted Trabucco's motion to dismiss the Nevada declaratory relief action, concluding that Cogan's collateral challenge of the Arizona malicious prosecution judgment was barred by the *Rooker-Feldman* doctrine. The court therefore denied as moot Cogan's motion for summary judgment. Cogan timely

appealed.  We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's decision de novo.  *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021).

**II**

We first address Trabucco's contention that the case is moot and that we therefore lack Article III jurisdiction.  *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  To establish mootness, Trabucco must show that "it is *impossible* for a court to grant *any* effectual relief whatever" to the plaintiff. *Id*. (emphasis added) (citation omitted).  That burden is a "heavy" one, *see Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006), and Trabucco has not carried it.

Trabucco argues that, because the parties' settlement agreement in the malicious prosecution case includes an express covenant "not to execute on the Judgment" in that case, Cogan has already obtained through that settlement any relief he might have obtained in this federal lawsuit.  *See FBI v. Fikre*, 601 U.S. 234, 240 (2024) (stating that, when "a complaining party manages to secure outside of litigation all the relief he might have won in it," then "a federal court must dismiss the case as moot"); *see also Allard v. DeLorean*, 884 F.2d 464, 466 (9th Cir. 1989) (holding that, in light of the parties' settlement of a separate matter, the plaintiff no longer had the ability to obtain any relief in the case on appeal).  This argument fails, because it overlooks the full scope of the relief sought by Cogan in his complaint in this case.  That complaint seeks a declaration, not only that any judgment in the malicious prosecution action is "not enforceable," but also that any such judgment is "not valid" and is instead "*void ab initio*" due to the state court's lack of "subject matter jurisdiction."     We conclude that the

requested further declaration of *invalidity* could grant a measure of "effectual relief" to Cogan that goes beyond what he has already obtained from the unenforceability covenant.

If Cogan wins this federal lawsuit, and the malicious prosecution judgment is declared to be void and to have been entered without jurisdiction, then the $8,000,000 liability reflected in that judgment would be *entirely* wiped out and Cogan would owe nothing. But if Trabucco wins this federal suit, then that state court judgment would remain in place. In that scenario, the settlement agreement says that two things occur: (1) Trabucco will not "execute on" that judgment[3]; and (2) Cogan will instead incur an equivalent, but dischargeable, contractual liability to pay Trabucco $8,000,000. Given these significant real-world differences associated with the grant or denial of the full declaration requested here—*i.e.*, a declaration that the Arizona judgment is entirely void and not merely that it cannot be enforced— an award of that broader requested declaration would produce *some* "effectual relief." *Chafin*, 568 U.S. at 172 (citation omitted). This case, therefore, is not moot.

Viewed this way, this case fits comfortably within the established line of cases holding that a partial settlement agreement specifying the *ultimate form* of redress that would result from success in litigation does not moot that litigation. For example, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the parties agreed that, if the Supreme Court

---

[3] Because a *void* judgment cannot be enforced, Trabucco's covenant not to execute becomes meaningfully operative only if the state court malicious prosecution judgment remains in place, *i.e.*, only if Cogan loses this federal suit. The covenant also effectively operates as a *stay* while the parties litigate the judgment's validity, but that purely temporary feature of the covenant, by its nature, cannot have the sort of permanent effect that might conceivably moot this case.

upheld the viability of the individual plaintiffs' complaint asserting Fair Housing Act violations, then each such plaintiff would "be entitled to $400 in damages and no further relief." *Id*. at 371. But if the Supreme Court rejected those claims, then these plaintiffs "would be entitled to no relief whatsoever." *Id*. The Court held that this agreement did not moot the parties' dispute, because the plaintiffs were seeking monetary relief and the agreement "merely liquidate[d] those damages," depending upon whether the Court held those claims to be viable. *Id*. Similarly, in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the former President was sued by a former Air Force employee who alleged retaliatory discharge, and while the Supreme Court was considering Nixon's claim of absolute immunity, the parties reached an agreement under which "Fitzgerald agreed to accept liquidated damages of $28,000 in the event of a ruling by th[e] Court that [Nixon] was not entitled to absolute immunity" and Fitzgerald would receive nothing further if the Court agreed with Nixon. *Id*. at 744. Citing *Havens Realty*, the Court held that an agreement to liquidate the value of claims while the parties litigated those claims' viability did not moot that litigation. *Id*.

The settlement agreement in this case is not materially distinguishable from those at issue in *Havens Realty* and *Nixon v. Fitzgerald*, and, as in those cases, it does not moot this litigation. The instant federal suit is a declaratory relief action by Cogan against Trabucco that collaterally challenges the validity of state court proceedings in which Trabucco seeks monetary relief from Cogan. As in *Havens Realty* and *Nixon v. Fitzgerald*, the issues on appeal concern the threshold viability of the plaintiff's underlying claims: if Cogan prevails in this federal action, Trabucco's monetary claims in state court will be wiped out (including Trabucco's

successful litigation of Cogan's liability for malicious prosecution), but if Trabucco prevails in this federal suit, then Cogan will be liable to Trabucco, with the exact form of that liability being fixed, as in *Havens Realty* and *Nixon v. Fitzgerald*, by the settlement agreement. Under those controlling decisions, this case is not moot. And, as in those cases, it is irrelevant that the liquidated redress specified in the settlement agreement does not take the form of an enforceable and collectable formal judgment. So long as the parties continue to have a live dispute over their underlying substantive rights, it does not matter what form of redress they chose to accept in the event that the still-litigated liability is not defeated.

We distinguished *Havens Realty* and *Nixon v. Fitzgerald* in *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125 (9th Cir. 2005) (en banc), and our analysis there confirms that the claims in this case are not moot. In *Gator.com*, L.L. Bean sent a "cease-and-desist letter" to Gator.com, asserting that Gator.com's use of "pop-up" advertisements "misappropriated the good will associated with [L.L. Bean's] trademark." *Id*. at 1127. Gator.com preemptively filed a declaratory relief action in the Northern District of California, seeking a declaration that the challenged practices did not violate any rights of L.L. Bean. *Id*. The district court dismissed the action for lack of personal jurisdiction over L.L. Bean, and Gator.com appealed. *Id*. at 1127–28. While that appeal was pending before the en banc court, Gator.com and L.L. Bean "reached a confidential settlement of other litigation in which they were involved." *Id*. at 1128. As part of the settlement, Gator.com agreed that, after three months, it would "permanently discontinue" the challenged practices, and L.L. Bean agreed to "renounce[] all claims arising from Gator's use of pop-up advertisements

prior to—or in accordance with—the agreement." *Id*. The settlement stated, however, that if Gator.com lost the appeal on the personal jurisdiction issue, then Gator.com would pay L.L. Bean $10,000. *Id*.

We held that the *substantive* issues raised by Gator.com's declaratory relief action were fully moot, because, under the settlement, Gator.com "has agreed to terminate its pop-up advertisements and has been released from liability for its past conduct." *Gator.com*, 398 F.3d at 1131. With the underlying substantive issues fully resolved, any decision concerning the discrete issue presented on appeal—*viz*., whether the Northern District of California could assert personal jurisdiction over L.L. Bean—would amount to an "advisory opinion[]." *Id*. at 1132 (citation omitted). We held that, unlike in *Havens Realty* and *Nixon v. Fitzgerald*, the parties had not preserved any ability for Gator.com to obtain any of the substantive relief that it had sought in its complaint. *Id*. at 1131–32. Because the remaining "personal jurisdiction issue [was] wholly divorced from any live case or controversy," the parties' agreement that L.L. Bean would be paid $10,000 if it prevailed on that abstract issue amounted to a "side bet" that could not save the case from mootness. *Id*. at 1132; *see also id*. at 1133 (Tashima, J., joined by Rymer and McKeown, JJ., concurring) (agreeing that, because no live dispute remained concerning the parties' underlying substantive "primary rights," the "outcome of the side bet would determine only whether the district court hypothetically could adjudicate a no-longer-existent dispute").

In this case, by contrast, the settlement agreement does *not* moot the dispute over the parties' underlying substantive rights. If Cogan prevails in this federal case, then the state court's substantive determinations will all be rendered void

and Cogan's underlying liability to Trabucco will be unresolved or even eliminated.  But if Trabucco prevails, then the state court's liability findings against Cogan will be preserved and his ensuing liability will be fixed and payable in accordance with the settlement's terms.  Thus, the very feature that was present in *Havens Realty* and *Nixon v. Fitzgerald* and missing in *Gator.com*—namely, a continuing dispute over the parties' underlying substantive rights—is present in this case.

Trabucco argues, in the alternative, that the settlement agreement here actually *has* fully resolved the parties' underlying substantive liabilities and that the dispute is therefore moot on that basis.  As noted earlier, the settlement agreement provides that if "Trabucco prevails in th[is] Nevada case—meaning, that the district court denies [Cogan's] request" for declaratory relief—then Cogan "agrees to pay [Trabucco] the sum of eight million dollars." Trabucco essentially argues that, under this language, Cogan's payment obligation became effective and *indefeasible* once "the district court denie[d]" Cogan's request and that a reversal of that district court ruling on appeal cannot undo that irrevocably fixed obligation.  By contrast, Cogan argues that a "reversal of the district court" would mean that the condition for his $8,000,000 payment obligation under the settlement agreement would no longer be met and he would then have no "obligation under the settlement agreement."  We agree with Cogan on this point.

Trabucco's proffered reading of the agreement's language—namely, that the parties' rights become irrevocably fixed once the district court initially enters an order denying Cogan's requested declaratory relief—is unreasonable and would lead to absurd results.  *See Roe v. Austin*, 433 P.3d 569, 575 (Ariz. Ct. App. 2018) ("[C]ourts

must avoid an interpretation of a contract that leads to an absurd result."); *see also Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993) ("The court must apply a standard of reasonableness in contract interpretation.").[4] Under Trabucco's reading, the mere initial entry of an order denying Cogan's request suffices to trigger Cogan's payment obligation, and it is irrelevant whether (due to a successful appeal or otherwise) that order is subsequently revoked and is *replaced* by a contrary order *granting* Cogan's requested declaration. This reading makes no sense. The more natural reading of the settlement's language addressing whether Trabucco "prevail[ed]" and Cogan was "denie[d]" relief by the district court would take into account the background availability of the various mechanisms (such as reconsideration and appeal) that might lead to an *alteration* of the relevant district court order. *See* 28 U.S.C. § 1291; FED. R. CIV. P. 59(e). If we were to direct the district court to withdraw its order denying Cogan's requested relief and to instead enter an order granting it, then the settlement's condition will not be fulfilled, and Cogan will have no obligation to pay anything. We therefore reject Trabucco's argument that the settlement agreement has fully resolved the parties' underlying substantive liabilities in a way that precludes us from granting any effectual relief.

---

[4] Trabucco's brief relies on general contract interpretation principles and does not address what jurisdiction's law governs the construction of the settlement agreement here. Cogan's reply brief affirmatively takes the position that Arizona law applies. We therefore assume that Arizona law applies, although we also perceive no basis for concluding that applying Nevada law or federal law would make a difference to the outcome.

### III

Having concluded that the appeal is not moot, we turn to considering whether the district court correctly dismissed this case under the *Rooker-Feldman* doctrine.

### A

"The *Rooker-Feldman* doctrine" limiting district court review of state court civil judgments "derives its name from two Supreme Court cases: *Rooker v. Fidelity Trust Company*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)." *Benavidez*, 993 F.3d at 1142 (simplified). In its current form, the doctrine is narrowly "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The doctrine's rationale, as explained in *Rooker*, is that only the Supreme Court, and not a district court, may exercise what is effectively appellate review over a state court civil judgment. In *Rooker*, a federal court plaintiff sought "to have a judgment" of an Indiana state court "declared null and void" on the ground that it violated the federal Constitution. 263 U.S. at 414–15; *see also Rooker v. Fidelity Trust Co.*, 261 U.S. 114, 115–16 (1923) (dismissing writ of error on direct review of the Indiana Supreme Court's decision and detailing the facts of the state court litigation). The Supreme Court held that the federal district court's entertaining of such an action would amount to "an exercise of appellate jurisdiction" over the state courts. *Rooker*, 263 U.S. at 416. However, only the Supreme Court had been

granted such appellate jurisdiction, and "[t]he jurisdiction possessed by the District Courts is strictly original." *Id*.; *see also* 28 U.S.C. § 1257 (current provision granting the Supreme Court jurisdiction to review final state court judgments raising certain federal issues).

Likewise, in *Feldman*, the Court held that, because "a United States District Court has no authority to review final judgments of a state court in judicial proceedings," the district court lacked jurisdiction to review the plaintiffs' direct collateral challenge to the D.C. Court of Appeals' denial of certain waiver petitions the plaintiffs had pursued in connection with their efforts to be admitted to the D.C. bar. 460 U.S. at 482. The plaintiffs instead "should have sought review" of those judgments in the Supreme Court. *Id*. *Feldman*, however, also placed an important limitation on the doctrine by drawing a distinction between challenging a particular as-applied state court decision and bringing a broader challenge to an underlying state statute governing such a decision. *See id*. at 483–87; *see also Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (explaining that, under *Feldman*, "a state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action"). Our caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment. *See*, *e.g.*, *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140–43 (9th Cir. 2004) (holding that *Rooker-Feldman* did not bar suit alleging extrinsic fraud by litigant in obtaining state court judgment).

Although the *Rooker-Feldman* doctrine's prohibition of district court review of state court civil judgments has been criticized as being "nearly redundant" to what would be

accomplished by application of preclusion principles, *see* 18B C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4469.1, at p.79 (3d ed. 2019) (hereafter "WRIGHT & MILLER"), the two are analytically distinct. "Unlike res judicata, which requires courts to look to the preclusive effect of prior judgments under *state* law, *Rooker-Feldman* looks to *federal* law to determine 'whether the injury alleged by the federal plaintiff *resulted from* the state court judgment itself or is distinct from that judgment.'" *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003) (emphasis added) (citation omitted). And, "unlike res judicata, the *Rooker-Feldman* doctrine is not limited to claims that were actually decided by the state courts, but rather it precludes review of all 'state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional.'" *Id*. at 901 (citation omitted).

**B**

As an initial matter, Cogan argues that *Rooker-Feldman* cannot apply here for the simple reason that, at the time he filed this federal action, no "judgment" had yet been entered in the Arizona malicious prosecution action. As noted earlier, that state court action had been remanded for a new trial on damages, and Cogan filed this federal suit a month before that retrial was scheduled to begin. Cogan points to the Supreme Court's statement in *Exxon Mobil* that *Rooker-Feldman* only applies to federal "cases brought by state-court losers complaining of injuries caused by state-court judgments *rendered before the district court proceedings commenced* and inviting district court review and rejection of those judgments." *See Exxon Mobil*, 544 U.S. at 284 (emphasis added). *Exxon Mobil* stated that, when state

proceedings are still ongoing, any parallel federal action might trigger "[c]omity or abstention doctrines," but *Rooker–Feldman* would not be "triggered simply by the entry of judgment in state court" while the federal action was still pending. *Id*. at 292. Instead, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Id*. at 293.

The district court concluded that *Rooker-Feldman* nonetheless applied because, during the state appellate proceedings that led to the remand, Cogan had argued to the Arizona Supreme Court that the state courts lacked jurisdiction over a matter involving federal bankruptcy proceedings, and after that court denied Cogan's motion raising that issue, he assertedly could have filed a petition for certiorari seeking review of that federal issue in the U.S. Supreme Court. Whether that state court "judgment" actually resolved that federal issue and whether it was sufficiently "final" to permit Supreme Court review at that point under 28 U.S.C. § 1257 raise abstruse issues that we need not resolve here. *See* 18B WRIGHT & MILLER, *supra*, § 4469.2, at pp. 102–03 (noting the "complication [that] arises in identifying the level of finality that must be reached to qualify a state-court judgment as one 'rendered before the district court proceedings commenced'" for purposes of *Rooker-Feldman* and noting that at least one circuit court has suggested that this may require drawing on "all of the pragmatic tests of finality that support Supreme Court review [under § 1257] before state-court proceedings have concluded"). Even assuming that Cogan's federal suit challenges a sufficiently final judgment that was entered before that suit was filed, we conclude that, for alternative reasons raised by Cogan, *Rooker-Feldman* still would not apply.

We have held that a "state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction *is* subject to collateral attack in the federal courts," *Gonzales v. Parks*, 830 F.2d 1033, 1036 (9th Cir. 1987) (emphasis added), and that the *Rooker-Feldman* doctrine therefore does not bar such suits, *see Henrichs v. Valley View Dev.*, 474 F.3d 609, 614 (9th Cir. 2007); *Gruntz v. County of Los Angeles* (*In re Gruntz*), 202 F.3d 1074, 1079 (9th Cir. 2000) (en banc). Invoking this line of cases, Cogan contends that Trabucco's malicious prosecution action is within the exclusive jurisdiction of the federal courts; that any judgment in that case is therefore subject to collateral attack in federal court; and that *Rooker-Feldman* thus does not bar this suit. We agree.

In *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996), we held that "state malicious prosecution actions for events taking place within . . . bankruptcy court proceedings are completely preempted by federal law." *Id*. at 912. We reasoned that "the unique, historical, and even constitutional need for uniformity in the administration of the bankruptcy laws" confirms that "Congress wished to leave the regulation of parties before the bankruptcy court in the hands of the federal courts alone." *Id*. at 915. We stated that "the highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors" further "underscore[d] the need to jealously guard the bankruptcy process from even slight incursions and disruptions brought about by state malicious prosecution actions." *Id*. at 914. We noted that, in *Gonzales*, we had held that, in light of the federal courts' exclusive jurisdiction over bankruptcy petitions, the state courts lack "subject matter jurisdiction to hear a claim that the filing of a bankruptcy petition constitutes an abuse of

process," *id*. at 915 (quoting *Gonzales*, 830 F.2d at 1035), and we held that this same reasoning extends to malicious prosecution actions against creditors, *id*. at 916. As we explained, "[t]he threat of later state litigation may well interfere with the filings of claims by creditors and with other necessary actions that they, and others, must or might take within the confines of the bankruptcy process." *Id*. We stated that "[w]hether creditors should be deterred, and when, is a matter unique to the flow of the bankruptcy process itself—a matter solely within the hands of the federal courts." *Id*. Relying on this reasoning, we held that malicious prosecution actions based on conduct during bankruptcy proceedings fell within the narrow class of cases in which the preemptive force of federal law is so strong that "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id*. at 912 (citation omitted). Although any such "purported action must, in fact, be a federal claim," that federal claim may only be "brought in the bankruptcy court itself" and cannot even be brought as a later "separate action in the district court." *Id*. at 916.

It follows inexorably from *MSR*'s reasoning and holding that Trabucco's malicious prosecution claim is completely preempted by federal law and may only be asserted in federal court as part of Trabucco's bankruptcy proceedings. We noted in *MSR* that Congress had provided a panoply of remedies to address misconduct occurring during bankruptcy proceedings, 74 F.3d at 915, but Trabucco did not invoke any of those. Instead, less than a month after Cogan's adversary complaint was dismissed, and while Trabucco's bankruptcy proceedings were still ongoing, Trabucco filed in Arizona state court a malicious prosecution action based on Cogan's adversary complaint in bankruptcy

court, which had challenged the dischargeability of Trabucco's asserted liability to the Scharfs. Trabucco's malicious prosecution action was thus squarely focused on contentions that Cogan had made in seeking a determination of nondischargeability from the bankruptcy court under § 523 of the Bankruptcy Code. Indeed, Trabucco expressly conceded, in his settlement agreement with Cogan, that Trabucco's malicious prosecution claim "arose solely out of the claim(s) and allegation(s) made" in Cogan's adversary complaint on behalf of the Scharfs. Trabucco's malicious prosecution claim against both the Scharfs and their lawyer thus directly implicates *MSR*'s concern that "[t]he threat of later state litigation may well interfere with the filings of claims *by creditors* and with other necessary actions that they, *and others*, must or might take within the confines of the bankruptcy process." *Id*. at 916 (emphasis added). Trabucco's claim therefore "must, in fact, be a federal claim" that "should have been brought in the bankruptcy court itself" and may not be brought in state court. *Id*.

Because Trabucco's malicious prosecution claim is completely preempted by federal law and is "within the federal courts' exclusive jurisdiction," it is "subject to collateral attack in the federal courts," *Gonzales*, 830 F.2d at 1036, and *Rooker-Feldman* therefore does not apply, *see Henrichs*, 474 F.3d at 614; *Gruntz*, 202 F.3d at 1079. Accordingly, the district court erred in dismissing Cogan's complaint as barred by *Rooker-Feldman*.

## IV

Trabucco argues that we may nonetheless affirm on the alternative ground that, regardless of whether it was correct under *MSR*, the Arizona Supreme Court's denial of Trabucco's motion to dismiss on similar jurisdictional

grounds has preclusive effect with respect to whether the
Arizona proceedings encroached on the exclusive
jurisdiction of the federal courts. Even assuming that the
Arizona Supreme Court's summary denial order actually
reached the merits of the exclusive-jurisdiction issue, we
conclude that Trabucco's argument is foreclosed by our
decision in *Contractors' State License Board of California
v. Dunbar* (*In re Dunbar*), 245 F.3d 1058 (9th Cir. 2001).
We held there that *Gruntz*'s "rationale" for concluding that
*Rooker-Feldman* does not bar collateral challenges to state
court judgments that intrude on the exclusive bankruptcy
jurisdiction of the federal courts "clearly applies," not just to
*Rooker-Feldman*, but also to "collateral estoppel" and "res
judicata." *Id*. at 1063; *see also Gruntz*, 202 F.3d at 1082 n.6
(noting that, under *Matsushita Elec. Indus. Co. v. Epstein*,
516 U.S. 367, 386 (1996), full faith and credit is not given to
a state court judgment where the rendering court lacked
subject matter jurisdiction to render the judgment).

To the extent that Trabucco rests his preclusion
arguments on the principle that the Arizona courts had
jurisdiction to determine their jurisdiction, his contention
still fails. That principle does not completely insulate any
such jurisdictional determination from being collaterally
attacked on the ground that the state court suit intrudes upon
the exclusive jurisdiction of the federal courts. The "general
rule of finality of jurisdictional determinations is not without
exceptions," and "in some contexts" must yield to
countervailing "[d]octrines of federal pre-emption or
sovereign immunity." *Durfee v. Duke*, 375 U.S. 106, 114
(1963) (citing, *inter alia*, *Kalb v. Feuerstein*, 308 U.S. 433
(1940), which held that state court proceedings that intruded
on the "bankruptcy courts['] exclusive jurisdiction over
farmer-debtors and their property" were "nullities subject to

collateral attack"). Where, as here, the relevant state law claims are completely preempted by federal law and are within the exclusive jurisdiction of the federal courts, that overriding preemption doctrine permits a collateral attack of even an express finding of jurisdiction by a state court. *See* 20 C. WRIGHT & M. KANE, FEDERAL PRACTICE AND PROCEDURE, FEDERAL PRACTICE DESKBOOK § 17, at p.122 (2d ed. 2011) ("[W]hen a federal statute has vested exclusive jurisdiction of a particular type of case in the federal courts, the finding by a state court that it has jurisdiction over such a case will not preclude collateral attack upon the judgment rendered in the state court.").

\*       \*       \*

For the foregoing reasons, the district court's determination that the *Rooker-Feldman* doctrine deprived it of subject matter jurisdiction over Cogan's declaratory relief complaint is reversed. The matter is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

M. SMITH, Circuit Judge, concurring:

I join the court's opinion in full. I write separately (1) to criticize some of our *Rooker-Feldman* precedents and (2) to highlight an unresolved circuit split on the question of whether attorneys who allegedly abuse the federal bankruptcy process, like Cogan, may be held accountable in state court.

**I**

The *Rooker-Feldman* doctrine generally precludes a federal district court from exercising subject-matter jurisdiction over an action that seeks "to 'overturn an injurious state-court judgment.'" *Brown v. Duringer L. Grp. PLC*, 86 F.4th 1251, 1253 (9th Cir. 2023) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–92 (2005)), *cert. denied*, 144 S. Ct. 1351 (2024). Nevertheless, if Congress expressly authorizes the federal district courts to review state-court judgments by statute, then the *Rooker-Feldman* doctrine does not apply. *See, e.g.*, 28 U.S.C. § 2254 (explicitly authorizing federal collateral review of final state-court criminal convictions).

We have expressly affirmed that principle on at least three separate occasions. *See In re Gruntz*, 202 F.3d 1074, 1079, 1081–83 (9th Cir. 2000) (en banc) (Congress, in enacting 11 U.S.C. §§ 544, 547–49, 727, 1129, 1135, 1141, 1325, and 1328, expressly empowered lower federal courts exercising original bankruptcy jurisdiction to avoid, modify, and discharge certain state-court judgments, and Congress, in enacting 11 U.S.C. § 362(a), necessarily authorized those courts to review state-court judgments that violate the automatic stay); *Mozes v. Mozes*, 239 F.3d 1067, 1085 n.55 (9th Cir. 2001) (Congress, in enacting 42 U.S.C. § 11603(a),

expressly authorized federal district courts to vacate state-court orders that contravene the Hague Convention), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. 68, 76 (2020); *Doe v. Mann*, 415 F.3d 1038, 1047 (9th Cir. 2005) (Congress, in enacting 25 U.S.C. § 1914, explicitly authorized federal district courts to invalidate state-court custody orders that violate specific provisions of the Indian Child Welfare Act). We have further observed in dicta that such "statutory authorizations to review state court judgments" are "rare," and that "[c]ourts have been loath to recognize [them]." *Doe*, 415 F.3d at 1043 & n.7. Moreover, we have positively cited decisions from other circuits suggesting that such statutory authorizations are the *only* way for state-court losers to circumvent the general rule that the lower federal courts cannot sit in appellate review of injurious state-court judgments. *See id.* at 1043 n.7 (citing *Ritter v. Ross*, 992 F.2d 750, 753 (7th Cir. 1993); *Johnson v. State of Kansas*, 888 F. Supp. 1073, 1080 (D. Kan. 1995), *aff'd*, 81 F.3d 172 (10th Cir. 1996)) (other citations omitted).

Nevertheless, it turns out there *is* another way in our circuit to circumvent the *Rooker-Feldman* bar. The bar does not apply when state-court losers seek lower-federal-court review of injurious state-court judgments rendered pursuant to state-law causes of action that are completely preempted by federal law. *See Henrichs v. Valley View Dev.*, 474 F.3d 609, 614 (9th Cir. 2007) (acknowledging that one way "to circumvent the jurisdictional bar" imposed by the *Rooker-Feldman* doctrine is to show that the injurious state-court judgment was "entered in a case that falls within the federal courts' exclusive jurisdiction" (citing *Gruntz*, 202 F.3d at 1079)). That rule controls the result here. Our decision in *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996), establishes that Trabucco's malicious

prosecution claim for events taking place within federal bankruptcy proceedings is, in reality, an exclusively federal claim for bankruptcy sanctions arising under Title 11 of the bankruptcy code and is completely preempted by federal law. *See id.* at 912. Accordingly, despite Cogan's failure to identify where exactly in the federal bankruptcy code Congress explicitly authorized the federal district courts to review the state-court judgments at issue in this litigation,[1] we can still conclude that the *Rooker-Feldman* doctrine does not apply. *See* Maj. 23.

However, I am not sure that the *Rooker-Feldman* rule we acknowledged in *Henrichs* is consistent with the U.S. Supreme Court's discussion of the doctrine in *Exxon Mobil*. In *Exxon Mobil*, the Supreme Court explained that, under the *Rooker-Feldman* doctrine, the lower federal courts do not have the statutory power to sit in appellate review of state-court judgments because Congress "vest[ed] authority to review a state court's judgment solely in [the Supreme] Court." 544 U.S. at 292. The Supreme Court then acknowledged only one circumstance under which the *Rooker-Feldman* doctrine, where it would normally apply, may fall away: "Congress, if so minded, may explicitly empower district courts to oversee certain state-court

---

[1] The various statutory provisions we identified in *Gruntz* as explicitly authorizing federal bankruptcy review of certain state-court judgments affecting the bankruptcy estate, *see* 11 U.S.C. §§ 362(a), 544, 547–49, 727, 1129, 1135, 1141, 1325, 1328, do not squarely apply to the state-court judgments rendered in Trabucco's state-court malicious prosecution case. All those bankruptcy provisions concern the assets of the bankruptcy estate during the pendency of bankruptcy. The state-court judgments that Cogan seeks to challenge, however, were issued several years after Trabucco's Chapter 7 estate terminated, and only impose damages against Cogan, a third-party attorney who never had any personal creditor claims to assert against the estate.

judgments and has done so, most notably, in authorizing federal habeas review of state prisoners' petitions." *Id.* at 292 n.8 (citing 28 U.S.C. § 2254(a)).    Reading this discussion, I am left with the strong impression that the question of whether *Rooker-Feldman* prevents a lower federal court from directly reviewing an injurious state-court judgment should turn on whether Congress, by statute, expressly authorized a lower federal court to engage in such review.

Our additional rule that *Rooker-Feldman* also falls away whenever a state-court judgment is "entered in a case that falls within the federal courts' exclusive jurisdiction," *Henrichs*, 474 F.3d at 614, regardless of whether Congress explicitly granted the lower federal courts review power, does not fit neatly into the Supreme Court's statutory rationale for the *Rooker-Feldman* doctrine.    While it is possible that Congress wanted the lower federal courts to be able to review all state-court judgments that were rendered pursuant to completely preempted state-law causes of action, that possibility is a mere inference about congressional intent and a far cry from the "explicit[]" congressional authorization for such review as contemplated by the Supreme Court in *Exxon Mobil*.**2**   544 U.S. at 292 n.8.

---

[2] If the rule we recognized in *Henrichs* is wrong, defendants to completely preempted state-court actions that exclusively belong in specific federal fora would not be without recourse.  Congress has famously crafted two procedural tools to ensure that state-law causes of action that are, in reality, exclusively federal claims get into the federal forum where they belong: removal and transfer.  *See, e.g.*, 28 U.S.C. §§ 1412(a), 1441(c), 1452(a), 1631; Fed. R. Bankr. P. 7087.  Had Cogan availed himself of these tools shortly after Trabucco filed suit in Arizona state court, more than five years of precious state judicial resources may not have been wasted.

Because of the rule we acknowledged in *Henrichs*, 474 F.3d at 614, we reverse the district court's holding that Cogan is jurisdictionally barred from asking the federal district court of Nevada to review and void judgments and orders issued by the state courts of Arizona, including the Arizona Supreme Court.[3]  Cogan may proceed with his endeavor despite his failure to identify any statutory provision in his complaint showing that Congress explicitly authorized such a maneuver.[4]

## II

Of course, the *Rooker-Feldman* rule we acknowledged in *Henrichs* is only relevant here because of our subsidiary conclusion that Trabucco's state-law cause of action for malicious prosecution is completely preempted by federal law.  *See* Maj. 22–23.  Trabucco's malicious prosecution action seeks to recover against Cogan for his conduct in Trabucco's Chapter 7 case, and we previously held in *MSR* that "state malicious prosecution actions for events taking place within . . . bankruptcy court proceedings are completely preempted by federal law."  74 F.3d at 912.

Trabucco devotes some of his answering brief to attacking the correctness of our holding in *MSR*.  Notably, at least two other federal courts of appeals have issued

---

[3] I, like the majority, assume that Cogan's federal suit challenges a sufficiently final state-court judgment that was entered before that suit was filed.  *See* Maj. 20.

[4] Cogan specifically relies on the Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201–02; Rule 9011 of the Federal Rules of Bankruptcy Procedure; and 11 U.S.C. § 105, in his complaint for declaratory relief. None of those provisions expressly contemplates the possibility of the federal district courts reviewing state-court judgments issued against third-party attorneys who have no personal stake in the bankruptcy estate.

decisions that directly conflict with *MSR*'s broad holding. For instance, the Third Circuit declined to hold that 11 U.S.C. § 303(i) completely preempts state-law tort claims, including malicious prosecution claims, regarding the bad-faith filing of involuntary bankruptcy petitions—i.e., events taking place within bankruptcy court proceedings. *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 52 (3d Cir. 1988). More recently, in *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 421 (3d Cir. 2016), the Third Circuit expressly disagreed with our holding in *In re Miles*, 430 F.3d 1083 (9th Cir. 2005), that state-law tort claims brought against petitioning creditors in state court are completely preempted by 11 U.S.C. § 303(i)—a holding which we stated was "compelled by the logic of our decision in *MSR*," *id.* at 1089.

Similarly, the Seventh Circuit held in *In re Repository Technologies, Inc.*, 601 F.3d 710 (7th Cir. 2010), that certain state-law tort claims based on a debtor's abusive filing of a voluntary bankruptcy petition are not completely preempted by the federal bankruptcy code because the code "does not provide . . . comprehensive, express remedies for" creditors harmed by abusive petitions. *Id.* at 724. That latter observation is fundamentally at odds with our own observation in *MSR* that Congress "provided a panoply of remedies to address misconduct occurring during bankruptcy proceedings," Maj. 22 (citing *MSR*, 74 F.3d at 915), such that Congress wished "to leave the regulation of parties before the bankruptcy court in the hands of the federal courts alone," *MSR*, 74 F.3d at 915.

In addition, the Supreme Court has sharpened the test for determining whether a state-law cause of action is completely preempted by federal law in the intervening years since we issued our 1996 decision in *MSR*. *See*

*Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207–10 (2004); *see also Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 687–88 (9th Cir. 2022) (the modern test for complete preemption asks: "(1) did Congress intend to displace a state-law cause of action and (2) did Congress provide a substitute cause of action?"), *cert. denied*, 143 S. Ct. 444 (2022). I am skeptical that 11 U.S.C. § 105 and Rule 9011 of the Federal Rules of Bankruptcy Procedure would satisfy the modern test for completely preempting state-law malicious prosecution claims for events taking place within bankruptcy proceedings (especially when those claims are brought against third-party attorneys, like Cogan, who never had any personal claims to assert against the estate). Nevertheless, I do not think that those intervening authorities from the Supreme Court are "clearly irreconcilable" with our holding in *MSR* to allow us to conclude that it has been effectively overruled. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Absent en banc reconsideration of *MSR*'s broad holding, we are bound by it.